UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION - DETROIT

IN RE:

ISSAM HAMADE,                                        Case No. 11-68553-wsd
                                                     Chapter 13
                                                     Hon. Walter Shapero
                Debtor.
_____/

## OPINION DENYING CREDITOR'S OBJECTION TO CONFIRMATION OF DEBTOR'S CHAPTER 13 PLAN AND DETERMINING AMOUNT OF CREDITOR'S PROOF OF CLAIM

### Factual Background

In April 2010, Issam Hamade (hereinafter, "Debtor") leased commercial space from Ibrahim Cacani (hereinafter, "Creditor"). The property in Dearborn Heights, Michigan (hereinafter, "the Premises") was to be used by Debtor for operating a restaurant. Debtor and Creditor signed a written lease agreement (hereinafter, "the Lease") commencing May 15, 2010. The Lease included "all equipment now in the [P]remises." Section 13 of the Lease requires that Debtor obtain Creditor's written consent before making any alteration, addition, or improvement to the Premises and also states that upon the termination of the Lease, additions or improvements, except movable office equipment and trade fixtures put in at the expense of Debtor, shall remain on the Premises and be the property of Creditor.

The operation was troubled from the moment Debtor took possession of the Premises. Debtor claims that the Premises was in poor condition and that much of the equipment was unusable. In preparing to open the restaurant, Debtor alleges he spent significant sums of money renovating and refurnishing the Premises. Debtor removed several pieces of existing equipment,

1

either by disposing of or scrapping them. Creditor and Debtor largely disagree about exactly what equipment was originally on site, as well as the age, condition, and value of such. Debtor claims that, during a phone call, Creditor impliedly consented to Debtor's removal of equipment. Creditor denies giving such consent and states that, in any event, the alleged verbal consent would be ineffective because the Lease requires that such be in writing.

Debtor eventually opened for business as the Pita Kabob Grill, but later defaulted on his rent obligations. On October 25, 2011, Creditor obtained a state court judgment against Debtor for (a) damages for unpaid rent and (b) an order of eviction, effective November 3, 2011. Debtor thereafter filed for bankruptcy and proposed a Chapter 13 plan (hereinafter, "the Plan"). Creditor filed a Proof of Claim for the sum of $198,074.96, composed of (a) the state court unpaid rent judgment; (b) litigation sanctions associated with the unpaid rent suit; (c) damages for the alleged conversion of the restaurant equipment originally on site; and (d) treble damages, costs, and litigation fees, in treating the conversion claim as that pursuant to Michigan's statutory conversion law. The issues before the Court are (a) Creditor's objection to the confirmation of the Plan on grounds that Debtor did not propose it in good faith and (b) Debtor's objection to Creditor's Proof of Claim.

The Court denies Creditor's objection to the confirmation of Debtor's Plan and sustains Debtor's objection to Creditor's Proof of Claim in part and denies it in part.


DISCUSSION

**I. The Issue of Debtor's Good Faith in Proposing the Chapter 13 Plan**

A bankruptcy court shall only confirm a Chapter 13 plan if the debtor has proposed it in good faith and not by unlawful means. 11 U.S.C. § 1325(a)(3),(7); *Marrama v. Citizens Bank of*

2

*Mass.*, 549 U.S. 365, 378 (2007). "As proponent of the plan, Debtor bears the burden of proving that the requisite tests for confirmation have been met. Thus, Debtor must persuade this Court that his proposed plan meets the statutory bases for confirmation contained in 11 U.S.C. § 1325." *In re Rose*, 101 B.R. 934, 938 (Bankr. S.D. Ohio 1989) (internal citations omitted). The debtor must be honest, forthcoming, truthful, and frank, both to the bankruptcy court and to creditors. The appropriateness of dismissal for lack of good faith hinges on this inquiry. *In re Alt*, 305 F.3d 413, 421 (6th Cir. 2002).

> Good faith is an amorphous notion, largely defined by factual inquiry. In a good faith analysis, the infinite variety of factors facing any particular debtor must be weighed carefully. We cannot here promulgate any precise formulae or measurements to be deployed in a mechanical good faith equation. The bankruptcy court must ultimately determine whether the debtor's plan, given his or her individual circumstances, satisfies the purposes undergirding Chapter 13: a sincerely-intended repayment of pre-petition debt consistent with the debtor's available resources. The decision should be left simply to the bankruptcy court's common sense and judgment....[C]ourts should take into account the totality of the circumstances confronting a debtor, not simply his or her pre-plan conduct, when deciding whether or not to confirm a Chapter 13 plan.

*In re Okoreeh-Baah*, 836 F.2d 1030, 1033-34 (6th Cir. 1988) (citing *Memphis Bank & Trust Co. v. Whitman*, 692 F.2d 427 (6th Cir. 1982)) (footnote omitted).

The non-exhaustive list of criteria for a bankruptcy court to consider is as follows:

> (1) the amount of the proposed payments and the amount of the debtor's surplus;
> (2) the debtor's employment history, ability to earn and likelihood of future increase in income;
> (3) the probable or expected duration of the plan;
> (4) the accuracy of the plan's statements of the debts, expenses and percentage repayment of unsecured debt and whether any inaccuracies are an attempt to mislead the court;
> (5) the extent of preferential treatment between classes of creditors;
> (6) the extent to which secured claims are modified;
> (7) the type of debt sought to be discharged and whether any such debt is nondischargeable in Chapter 7;
> (8) the existence of special circumstances such as inordinate medical expenses;

3

(9) the frequency with which the debtor has sought relief under the Bankruptcy
    Reform Act;
(10) the motivation and sincerity of the debtor in seeking Chapter 13 relief;
(11) the burden which the plan's administration would place upon the trustee;
    and,
(12) whether the debtor is attempting to abuse the spirit of the Bankruptcy Code.

*In re Caldwell*, 895 F.2d 1123, 1126-27 (6th Cir. 1990) (citing *In re Okoreeh-Baah,* 836 F.2d at

1032 and *Matter of Kull*, 12 B.R. 654, 659 (Bankr. S.D. Ga. 1981)).  *See also In re Alt*, 305 F.3d

at 419.  These twelve factors will be addressed in turn.

*(1) The amount of the proposed payments and the amount of Debtor's surplus*

    Debtor's Plan will result in a less than three percent dividend to unsecured creditors.  That

three percent figure assumes a finding that Debtor is liable for treble damages on Creditor's

conversion claim and litigation sanctions on the unpaid rent judgment.  To the extent that

assumption is unwarranted (which the Court finds to be the case), that percent would increase.[1]

    In any case, "good faith does not necessarily require substantial repayment of the unsecured

claims[.]"  *In re Caldwell*, 851 F.2d at 859 (quoting *Public Finance Corp. v. Freeman*, 712 F.2d

219, 221 (5th Cir.1983)).  "Bankruptcy decisions have ranged from confirmation of zero percent

plans to requiring 70 percent plans.  Many courts have chosen to apply a flexible standard… in

determining whether good faith exists."  *In re Celeste*, 9 B.R. 392, 393 (Bankr. N.D. Ohio 1981)

(footnotes omitted) (confirming a Chapter 13 plan that proposed an eight percent dividend to

unsecured creditors).  The Plan does not lack good faith simply because the dividend to

unsecured creditors is low.

---

[1] Debtor's Schedule F declares a total of $38,866.44 of unsecured claims, including a debt to Creditor in the amount
of $25,000.00 for the unpaid rent (significantly less than the damages Creditor claims).

*(2) Debtor's employment history, ability to earn, and likelihood of future increase in income*

Debtor makes a credible claim of a stable income as the manager and operator of a different restaurant in Ann Arbor, Michigan, in which he owns a 50% partnership share, and claims the restaurant has a value in the area of $50,000 to $60,000. Debtor receives a modest monthly salary, which, while unlikely to increase significantly in the near future, can partially be used to fund his Plan. Such facts, along with the others, militate in favor of a finding of good faith.

*(3) The probable or expected duration of the Plan*

The Plan proposes payments to Creditor over a period of five years and the Court thus sees no reason to find that this factor weighs against good faith.

*(4) The accuracy of the Plan's statements of the debts, expenses, and percentage repayment of unsecured debt and whether any inaccuracies are an attempt to mislead the Court*

Creditor argues that Debtor has engaged in a pattern of evasiveness and untruthfulness in proposing the Plan. These allegations specifically involve Debtor's conduct during the discovery process and his disclosures on the Statement of Financial Affairs.

First, Creditor argues that Debtor failed to provide frank and full responses to some of Creditor's interrogatories. Debtor was initially either unable or unwilling to provide the address of Debtor's nephew, Mohamad Yassin, who had loaned money to Debtor, so that Creditor's counsel may depose him, subpoena him, or both. Debtor did provide Mr. Yassin's name, telephone number, and the fact that he resides in Dearborn, Michigan. Whether Debtor failed to provide the address due to evasiveness or to genuine failure to remember is not clear from the record. Regardless, the matter is relatively inconsequential in any event, and bears little relevance to the issue of good faith in proposing the Plan.

5

Second, Creditor argues that post-filing, Debtor failed to provide facts or documents relating to a loan from Mr. Yassin, nor any documents relating to the sale of real estate to Debtor's sister. Both transactions were of a very informal nature. It is a fact that both Debtor and Creditor habitually carried out their respective businesses in an informal manner, often forgoing formalities of documentation, particularly when it came to Debtor's financial transactions with family members. In light of the testimony offered, both noted transactions reflect some sort of "mutual verbal understanding" on behalf of the transacting parties. It is probable that documents relating to these transactions were never drafted, and thus could not be disclosed to Creditor during discovery. Further, Creditor had the opportunity to examine Debtor regarding both transactions and, in fact, used that opportunity to obtain more information. Whatever testimony Creditor could have obtained through the discovery process, he obtained, or could have obtained, at the evidentiary hearing. Regardless, these alleged omissions during the discovery process generally do not weigh heavily against a finding of good faith.

Creditor argues as relevant to good faith Debtor's failure to disclose on his Statement of Financial Affairs the debt from the loan from Mr. Yassin and Debtor's receipt of money from a land sale, hereinafter detailed, both of which took place before Debtor filed for bankruptcy. As noted, the loan transaction was of a very informal nature. Debtor and Mr. Yassin apparently reached a verbal agreement that Mr. Yassin would loan money to Debtor, but they failed to agree upon terms for repayment. Debtor testified that the loan obligation was wholly conditional on his ability to repay and that he believed Mr. Yassin had no intent to sue in the event of a default. For this reason, Debtor states that he failed to include the loan on his schedules because he believed it to be separate and apart from the bankruptcy process. This is somewhat reinforced by the fact that Mr. Yassin has not filed a Proof of Claim. Yes, Debtor should have included that

6

debt on his Schedules, despite its informal nature.  However, this omission appears inconsequential, and most importantly, the Court sees no deceptive intent by Debtor and, regardless, its weight on the issue of good faith is minor.

With regard to Debtor's alleged income from a land sale, the details remain murky, though the evidence Debtor provided is somewhat inconsistent.  During his January 2012 deposition, Debtor gave testimony that he received $55,000 from a land sale in Lebanon in the form of cash, check, or some combination of the two.  (Exhibit 6, pgs. 19-22).  In his April 2012 response to Creditor's interrogatories and in response to the question "…did you transfer or sell any interest in any real property anywhere in the world?" Debtor responded "Yes, sold land in Lebanon." (Exhibit 7, pg. 9).  This answer might indicate that Debtor sold land that he *personally* owned and that he obtained *money* from the sale.  However, at the evidentiary hearing, Debtor testified that the land in question was owned by *Debtor's mother* and that he did not receive cash from this sale, but rather, he obtained *relief from a debt* he owed to his sister, by virtue of having acted as a guarantor for his brother's obligation to pay rent to Debtor's sister.  When the brother defaulted on this obligation, Debtor thus became indebted to his sister.  Debtor claims that his mother sold the land to the sister at a large discount in order to relieve Debtor from this obligation.  Thus, if true, Debtor's benefit from the land sale was in the form of debt forgiveness, rather than money.  It remains unclear whether the interrogatory response was the product of a failure to understand the question[2] or whether Debtor knowingly provided false testimony.

Debtor's explanation of the land sale transaction, if believed, fails to answer the question of where Debtor obtained the money to renovate the restaurant, which was the reason why the question was originally asked.  Failing to include this transaction on his Statement of Financial

---

[2] As part of the same interrogatory, when Debtor was asked to state the value of each interest in land he transferred, he responded "Unable to understand question."  There was no follow up.

Affairs does weigh against a finding of good faith, though that is ameliorated by his amending his Statement of Financial Affairs to reflect a payment to his sister, who is listed as a creditor, in the amount of $25,000. On balance, this item might be a negative in the good faith inquiry.

*(5) The extent of preferential treatment between classes of creditors*

This factor is not relevant to the inquiry here.

*(6) The extent to which secured claims are modified*

This factor is not relevant to the inquiry here.

*(7) The type of debt sought to be discharged and whether any such debt is nondischargeable in Chapter 7*

Creditor argues that, because Debtor allegedly converted the replacement restaurant equipment, which the terms of the Lease required him to leave on the Premises and in Creditor's possession, the underlying cause of this debt was a willful and malicious injury, making the debt nondischargeable in a Chapter 7 case, pursuant to § 523(a)(6). The argument is that by filing for Chapter 13 (where such a debt *can* be discharged if all payments under the plan are completed) rather than Chapter 7, Debtor was attempting to escape that obligation and that such is evidence of bad faith.

In Chapter 13 bankruptcy, debtors often seek to discharge debts stemming from their willful and malicious acts. Yet courts do not find that all such Chapter 13 plans are lacking in good faith. A debt that follows a willful and malicious act can, in fact, be discharged through a Chapter 13 bankruptcy. *See In re Caldwell*, 895 F.2d at 1126. However, "Courts should not approve Chapter 13 plans which are nothing more than 'veiled' Chapter 7 plans." *Id.* (citing *In re Girdaukas*, 92 B.R. 373, 377 (Bankr. E.D.

8

Wis. 1988)).  Also, it is important to distinguish between bad faith in *incurring the debt* and bad faith in *proposing the bankruptcy plan*.  The Court rejects the notion that a Chapter 13 plan is, perforce and for that reason alone, lacking in good faith simply because the underlying debt was incurred in a willful and malicious manner.

For purposes of considering its effect on the good faith issue, one does not need to actually and finally decide the issue of dischargeability.  That is for another time and in the context of another proceeding designated for that purpose.  For purposes of this aspect of the good faith inquiry, it suffices to say that (a) Creditor alleges the debt is nondischargeable under § 523(a)(6), which requires a finding of both willfulness and maliciousness; and (b) based on the limited evidence adduced at the hearing, while Debtor's alleged conversion appears to reflect the element of willfulness, it is highly questionable whether there exists the required element of maliciousness.  So, at best, there is a legal issue as to the dischargeability of the debt.  Keeping in mind that the dischargeability of the debt is but one of the many considerations relevant to the good faith issue, and, even assuming for purposes of argument that the debt is nondischargeable, the Court still must decide the weight to be given to that factor out of those many other considerations.  Furthermore, the less clear the ultimate decision on dischargeability, the less weight that should be accorded that factor.

What is involved here is not a "veiled" Chapter 7 plan.  Debtor's schedules list some thirteen unsecured creditors other than Creditor, as well as one priority creditor and two secured claims – one on a residence he indicates he is surrendering and the other a water bill.  The liquidation analysis indicates some $4,010.90 as being available for creditors in a Chapter 7 case (with the debt to Creditor listed at $25,000 out of a total unsecured debt

9

listed at $38,166.44). Under these circumstances, the weight to be given this factor is minimal.

 *(8) The existence of special circumstances such as inordinate medical expenses*

This factor is not relevant to the inquiry here.

*(9) The frequency with which Debtor has sought relief under the Bankruptcy Reform Act*

Debtor admittedly filed for bankruptcy previously, but around fourteen years ago. The debts from the earlier filing are not related to the current case. There is no indication that Debtor is attempting to evade his obligations or subvert the bankruptcy system through repeated filings. In this regard, Debtor met his burden in demonstrating good faith.

*(10) The motivation and sincerity of Debtor in seeking Chapter 13 relief*

The Court views Debtor's motivation for filing Chapter 13 bankruptcy as an attempt to find relief from his debts and gain a fresh financial start. Debtor seeks to repay his creditors insofar as he is capable. The evidence does not support a conclusion that Debtor's motivation and sincerity are questionable.

*(11) The burden that the Plan's administration would place upon the trustee*

This factor is not relevant to the inquiry here.

 *(12) Whether Debtor is attempting to abuse the spirit of the Bankruptcy Code*

The [Bankruptcy] Code's central purpose is remedial: to afford the honest but unfortunate debtor "a new opportunity in life with [sic] a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt." But debtors who do not file in good faith and seek to abuse the bankruptcy process should not be afforded relief.

10

*In re Pike*, 258 B.R. 876, 880-81 (Bankr. S.D. Ohio 2001) (quoting *Loc. Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934)) (internal citations omitted).  The spirit of the Bankruptcy Code is to provide burdened debtors with a fresh start and to enable them to recuperate financially, which is consistent with the situation here.

In sum, while some of the factors might be considered as negatively affecting good faith, consideration of them all, and affording them their proper weight, requires a conclusion that Debtor has carried his burden of proving good faith.

## II. The Amount of Creditor's Claim

Creditor's objected-to Proof of Claim seeks (a) $18,536.96 for unpaid rent for the leased Premises, arising from a state court judgment for that amount, together with $5,625 for litigation sanctions stemming from these state court proceedings; (b) $57,970 for Debtor's alleged conversion of property belonging to Creditor; and (c) treble damages based on Creditor's claim of statutory conversion, together with attorney's fees and costs.

The applicable law on the burden of proof in respect to claims and objections may be stated as follows: (a) the filed claim, if it meets the filing requirements as to form and content, is prima facie proof of its validity; (b) the burden of going forward then shifts to the objecting party to produce evidence sufficient to negate the prima facie validity of the filed claim, i.e. evidence, which, if believed, would refute an allegation essential to the claim's validity; and (c) if the objecting party carries that burden, the ultimate burden of proof is on the claimant to prove the validity of the claim by a preponderance of the evidence.  *See eg: In re Kemmer*, 315 B.R. 706, 711 (Bankr. E.D. Tenn. 2004).

A. The Claim for Unpaid Rent and Associated Litigation Sanctions

Debtor does not dispute the $18,536.96 debt, but objects to Creditor's claim for litigation sanctions. In the state court judgment's space labeled "Costs," there is no number. Neither the judgment nor any other submission mentions any litigation sanctions. At the evidentiary hearing, neither Creditor nor his attorney was able to substantiate the alleged litigation sanctions. Creditor admitted that he was unaware of the source of this claim. Debtor's objection to this aspect of the claim is sustained.

B. The Claim for Conversion of Equipment

Creditor claims that Debtor wrongfully sold, scrapped, or otherwise disposed of the equipment belonging to Creditor that was originally on the leased Premises. Creditor composed a list of equipment that he claims was on the Premises at the beginning of the Lease, testifying, however, that he composed this list shortly after Debtor was evicted, and some time after Debtor disposed of the equipment. Creditor concedes he had rarely visited the Premises and then only for short periods of time, but was somehow able to make this list from memory. He testified that the Premises was "torn apart" at the time he made the list and recalls having difficulty remembering what items used to be there. Creditor also claims this is only a partial list of the items and that some "small items" were not included. On this list, a small minority of items have an indication of their age. The rest are supposedly around ten years old. Each item on the list has a price, but no indication how Creditor reached that valuation or its source. The total value of all listed items is $57,970. Because Creditor's claim includes his identifying information, basis for claim, amounts claimed, and is corroborated by a supporting document, it is prima facie evidence of that claim. The only item for which Creditor has not established a prima facie case

12

is the slicer machine, which Creditor listed on Exhibit 2 but later testified he did not believe actually belonged to him.

What is to be noted in this case is that (a) Creditor is the only witness to testify as to the value of the indicated items in dispute and did not produce any third party or expert testimony on the subject; (b) Debtor *did not* himself even testify as to any of those values, let alone produce any third party or expert evidence on the subject; and (c) Debtor argues only that Creditor's testimony on values is not worthy of belief and thus should be ignored, in whole or in part.

Debtor contests what he believes to be Creditor's "inflated" values, testifying that much of the equipment on the Premises was unusable, rusted, unsanitary, and worthless, and was disposed or sold for scrap for those reasons. Debtor also questions Creditor's valuation methods. Indeed, Creditor was unable to explain in any detail how he reached these figures, other than that he consulted restaurant supply catalogues and had his son consult restaurant supply websites. Although Creditor was unable to name the catalogues or websites used, he claims to have utilized the value of *used* equipment in reaching what he described as "low" values. The equipment was not insured by either party. Creditor's testimony may be properly characterized as off the top-of-my-head estimates that are largely unsubstantiated.

There are multiple categories of items that the Court can address separately. First, there are items for which Creditor established a prima facie case and which Debtor has admitted were on the Premises, but for which Debtor has specifically challenged the inherent credibility of Creditor's valuations. Those consist of: a second grill, presently valued at $5,500, which Creditor claims he purchased for about $7,500 around the year 2000; an ice cream freezer with sliding doors, which he purchased for about $5,000 around the year 2000, with a present value of $3,800; and coffee cups (with no specification as to the quantity), valued at $180. Debtor

13

challenges the condition of this last item, claiming that they were "mostly broken" and says, as to the others, that they depreciated over a ten or so year period, which would make them worthless. As to this category, the Court agrees with Debtor and denies Creditor's Proof of Claim in entirety as to such.

Next, there are items as to which each party simply stated its account of their existence, to wit: a cash register, pie case with sliding doors, security cameras, soup warmer, tv and stereo with speakers, and a two door refrigerator. Debtor's testimony that these items were never originally on the Premises meets Creditor's testimony with equal force and is sufficient to rebut Creditor's prima facie case, and thereafter, Creditor offered no testimony that supports the claims at all, let alone by a preponderance of the evidence. In addition to these items, Debtor adequately rebutted Creditor's assertion that Debtor converted eleven pictures by stating that they are in Debtor's home and that Creditor is free to recover them and, believing Debtor, that ends the matter as to these items.

Last, there are several items as to which Creditor established prima facie claim validity that Debtor did not sufficiently rebut or challenge, i.e. Debtor does not specifically challenge Creditor's valuation beyond simply declaring that all of those items were worthless. With regard to these items, Debtor's objection to Creditor's Proof of Claim is denied and Debtor is appropriately liable for some amount as to the following items: coffee table with drawers, deep fryer, dishes, egg burner with four burners, freezer, garbage disposal, glass cups, grill, ice machine, neon lights/signs, pots and pans, seven pairs of custom window blinds, silverware, soup warmer table, stainless steel cutting table with shelves, steam table, two dish carts, two-door sandwich unit fridge, two-door stainless refrigerator, a second two-door stainless refrigerator,

14

two-door upright freezer, and water glasses.  The total value of these items, as listed on Exhibit 2 is $33,280.

The Court is not persuaded by the accuracy of the list of these items Creditor provided, nor the values it asserts.  By Creditor's own admission, he composed the list from his memory of the Premises, which he did not visit often.  What is to be weighed here is Creditor's motive to inflate the values, particularly as Creditor had just obtained a judgment against Debtor for unpaid rent, which has not been paid, as against the logic of Debtor throwing away items that were still valuable.  Were these items still useful and in good condition, as Creditor contends, logic would indicate that either Debtor would have kept and used them, rather than borrowing money to replace them, or that Creditor would have taken more prompt steps to realize their value.  The problem in this regard is the lack of affirmative proof of the values emanating from the Debtor. Given that, and in light of the apparent age of the subject items and the various other recited facts, the Court concludes the value of these items should be set at $7,000.  The Court is persuaded that Debtor likely acted in good faith in disposing of the items, whether or not pursuant to any actual or implied oral consent from the Creditor.

C. The Claim for Treble Damages, Attorney's Fees, and Costs

As noted, Creditor makes a claim for treble damages, together with attorney's fees and costs, pursuant to Michigan's statutory conversion law, which states that a person damaged as a result of a theft, embezzlement, or conversion "*may* recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney fees[.]"  M.C.L. § 600.2919a (emphasis added).  "[T]reble damages are permissive.  Therefore, the trier of fact has the discretion to decide whether to award treble damages[.]"  *LMT Corp. v. Colonel, L.L.C.*, 294063, 2011 WL 1492589 (Mich. App. 2011) (citing *Manuel v. Gill*, 481 Mich. 637, 647 (2008)).  The Court does

not believe this situation is even factually close to being appropriate for using its discretion to grant treble damages, costs, nor attorney's fees to Creditor, and sees no legal reason to grant such.

CONCLUSION

For the foregoing reasons, the Court denies Creditor's objection to the confirmation of Debtor's Plan, and with regard to Debtor's objection to Creditor's Proof of Claim, it is sustained in part and overruled in part. As to Creditor's claim, it is allowed in the amounts of (a) $18,536.96 and (b) $7,000, totaling $25,536.96. Debtor shall present an appropriate order.

.

**Signed on February 15, 2013**

                                        **/s/ Walter Shapero**
                                    _____
                                        **Walter Shapero**
                                        **United States Bankruptcy Judge**